United States District Court
Southern District of Texas
**ENTERED**
December 01, 2020
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **BARRY BATCHELOR,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:18-cv-3628** |
| | § | |
| **LIFE INSURANCE COMPANY OF** | § | |
| **NORTH AMERICA,** | § | |
| | § | |
| **Defendant.** | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Employee Retirement Income Security Act ("ERISA") matter comes before the Court on Plaintiff Barry Batchelor's motion for a judgment on the record pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. (Doc. 15). After close consideration of the administrative record, the Court concludes that Plaintiff is entitled to long-term disability ("LTD") benefits under the terms of the Policy. The Court submits the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.[1]

### I.   BACKGROUND

Plaintiff is currently fifty-eight years old and was formerly employed by BP America, Inc. He brings this action under 29 U.S.C. § 1132(a)(1)(B) to recover LTD benefits under an ERISA-governed employee welfare benefit plan (the "Policy") administered by Defendant Life Insurance Company of North America ("Defendant" or "LINA"). Plaintiff previously received LTD benefits from 2011 to 2016 before LINA discontinued those benefits. Plaintiff contends that he is disabled

---

[1] To the extent any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law; and to the extent any Conclusion of Law reflects a factual finding, it shall to that extent be deemed a Finding of Fact.

under the terms of the Policy due to his physical limitations caused by myofascial pain syndrome, fibromyalgia, and related conditions, and therefore LINA improperly terminated his LTD benefits. LINA maintains that, despite Plaintiff's diagnosed conditions, video surveillance footage and the lack of objective medical evidence demonstrate that he is not disabled.

## II.    STANDARD OF REVIEW

The standard of judicial review afforded benefits determinations under 28 U.S.C. § 1132(a)(1)(B) depends on whether the policy vests the claims administrator with discretionary authority. If a plan does not lawfully delegate discretionary authority to the plan administrator, "a denial of benefits . . . is to be reviewed under a *de novo* standard." *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (internal quotations omitted). In this case, the parties agree that the Policy does not provide the administrator with discretionary authority and have therefore stipulated to *de novo* review. (Doc. 10). The Court will accordingly review this matter *de novo*.

Although the Fifth Circuit has not specified what *de novo* review requires in ERISA cases, other circuits and district courts provide instructive guidance. *See Pike v. Hartford Life Ins. & Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1072-74 (E.D. Tex. 2019) (citing various cases for *de novo* standard of review). A court must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy." *Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010); *see also Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (explaining that courts must "mak[e] an independent decision about the employee's entitlement to benefits"). The defendant's decision to terminate benefits "is not afforded deference or a

2

presumption of correctness," but rather the court must "evaluate the persuasiveness of each side's case," *Pike*, 368 F. Supp. 3d at 1030-31 (internal citations omitted).

Plaintiff bears the burden of proving by a preponderance of the evidence that he is disabled within the terms of the Policy. *Id.* at 1072 (citing *Oliver v. Aetna Life Ins. Co.*, 613 F. App'x 892, 896 (11th Cir. 2015)). The burden of proof continues to lie with the plaintiff even if the plaintiff previously qualified for disability benefits. *Id.* (citing *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294-96 (9th Cir. 2010)).

Plaintiff seeks a judgment on the record pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[2] That rule provides that in "an action tried on the facts without a jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision." *Id.* In the Fifth Circuit, "Rule 52(a) does not require that the district court set out [its] findings on all factual questions that arise in the case." *Koenig v. Aetna Life Ins. Co.*, No. 4:13-CV-0359, 2015 WL 6554347, at *3 (S.D. Tex. Oct. 29, 2015) (citing *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1054 (5th Cir. 1997)). In articulating findings of fact, Rule 52(a) "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness." *Cent. Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (quoting *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir. 1996)). Instead, the rule is satisfied where the findings present the reviewer with "a clear

---

[2] Courts have noted that a trial on the papers under Rule 52(a) is effective in the ERISA context because courts may resolve factual disputes and issue legal findings without the parties resorting to cross motions for summary judgment. *Pike*, 369 F. Supp. 3d at 1025; *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1998) (noting that "in a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true").

understanding of the basis for the decision." *Id.* In accordance with Rule 52(a), this Memorandum and Opinion first lays out the Court's findings of fact followed by its conclusions of law.

## III.   FINDINGS OF FACT

1.   Plaintiff Barry Batchelor was employed by BP America, Inc. from 1999 to 2009. AR 943.[3] Plaintiff began his career as a drilling engineer—first for Exxon, then Amoco, until he moved to BP America in 1999. *Id.* In 2001, Plaintiff transitioned from engineering to procurement at BP America. *Id.* He worked in procurement until 2008, at which point he briefly transitioned back to work as a drilling engineer. *Id.*

2.   As a procurement specialist, Plaintiff's job required "continuous sitting, while working at a computer for up to 8 hours per day, with the ability to get up move around and alternate between sitting and standing (sic)." AR 2736. He was transferred to drilling engineering in an attempt to help with his physical limitations as it was a less demanding job. AR 2733. But by June 2009, Plaintiff was unable to complete any job and was placed on short-term disability by BP America. AR 2736.

3.   Plaintiff's job as a drilling engineer is categorized at a "light" work level under the Dictionary of Occupational Titles ("DOT").[4] AR 943. The job requires sitting at a desk or in meetings most of the time, including substantial computer work. *Id.* BP America

---

[3] The Court will refer to the administrative record found at Docket Number 13 as "AR __."

[4] The DOT describes "light" work as a job that requires walking, standing, or sitting to a significant degree. It also involves exerting up to twenty pounds of force occasionally, ten pounds frequently, and negligible amounts of force constantly. "Sedentary" work involves sitting most of the time, but can involve walking or standing for brief periods. It also involves exerting up to ten pounds occasionally or negligible amounts frequently to lift, carry, push pull, or otherwise move objects, including one's own body. AR 944.

described Plaintiff's job as sitting at a computer 80% of the time, with extensive computer work, and the remaining time spent on the phone or in meetings. *Id.*

4.  As an employee, Plaintiff was covered under a disability policy, No. LK-0030287 (the "Policy"), administered by LINA. AR 1. The Policy defines disability as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is either:
>
> > i.  unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative; or
> >
> > ii.  unable to earn 80% or more of his or her Indexed Covered Earnings.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is either:
>
> > i.  unable to perform all the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training, or experience; or
> >
> > ii.  unable to earn 80% or more of his or her Indexed Covered Earnings.

AR 4. The Policy requires "proof of earnings and continued Disability." *Id.*

5.  The latter definition applies to Plaintiff's claim for LTD benefits.

6.  Plaintiff's indexed covered earnings amounted to $179,742.72 per year, making the wage requirement $143,794.20 per year. AR 1517.

7.  As of 2017, Plaintiff suffers from a wide range of conditions including fibromyalgia, chronic pain syndrome, myofascial pain syndrome, gastroesophageal reflux disease, hiatal hernia, diabetes, neuropathy, pelvic pain and muscle spasm, pruritus, mild posterior left

paracentral protrusion, carpal tunnel syndrome, laryngopharyngeal reflux, chronic laryngotracheitis, osteoporosis, scoliosis, and degenerative disc disease. AR 332-33.

### A.  Initial Determination of Disability

8.  Plaintiff first began experiencing muscle pain and joint pain in 2001. AR 2733. He was able to make several ergonomic adjustments at his work, and his pain subsided. *Id.* However, his symptoms returned in March 2007. *Id.* He completed seven months of physical therapy but his condition continued to worsen. *Id.* He was eventually diagnosed with myofascial pain, chronic fatigue syndrome, and Lyme's disease. AR 2221.

9.  In May of 2009, Plaintiff began seeing Dr. Tova L. Alladice, a board-certified physical medicine and rehabilitation physician, regarding his chronic myofascial pain.[5] AR 2221. In June 2009, he was referred to Dr. Patricia Salvato for pain management and chronic fatigue. *Id.* Dr. Alladice referred Plaintiff to Dr. Salvato because of the latter's "extensive experience" in treating chronic fatigue and chronic pain from Lyme disease. AR 310. Drs. Alladice and Salvato have remained Plaintiff's treating physicians with respect to his most relevant conditions. AR 2221.

10. As of June 2009, Plaintiff was unable to complete his job as a result of myofascial pain syndrome and fibromyalgia. AR 2064. He was placed on short-term disability at that time. AR 2730.

---

[5] Myofascial pain syndrome is known to be a chronic pain disorder and is a condition that affects the muscles and tissues surrounding the muscles, causing severe pain. AR 354. Pain can worsen with activity and stress. *Id.*

11. Plaintiff applied for LTD benefits on July 24, 2009. AR 349. Plaintiff's LTD claim was initially denied because "the medical records d[id] not provide recorded evidence of physical functional limitations." AR 2066. Specifically, the evidence lacked documentation of functional deficits by clinically measurable testing (such as validate[d] range of motions or strength measurements) to support restriction indicated by the treating physician . . . from performing sedentary work activities." AR 2068.

12. Plaintiff thereafter submitted a Functional Capacity Evaluation ("FCE") which was completed on April 15, 2010. AR 2735-38. The evaluation concluded that, although Plaintiff could perform at a "DOT LIGHT" level of work, there were "other limiting factors such as pain, fatigue, and his inability to work in static positions for prolonged periods of time." AR 2736. The evaluation reported that Plaintiff was limited by continuous, severe pain, and could tolerate only thirty minutes of sitting and fifteen minutes of standing. AR 2736. He could only complete these activities on an "occasional" basis. AR 2736-37.

13. Work tolerance is categorized as "occasional," "frequent," or "constant." AR 2736. Occasional work tolerance is defined as an ability to complete the activity from 1 to 33% of the workday. *Id.* Frequent tolerance is defined as an ability to complete the activity from 34 to 66% of the workday. *Id.* Lastly, constant work tolerance is defined as an ability to complete the activity from 67 to 100% of the workday. *Id.*

14. LINA requested a second FCE that was conducted on March 22, 2011. AR 3216. Based on the physical examination and interview, the evaluator concluded that Plaintiff could sit, walk, drive, and complete various other activities only on an "occasional" basis. AR 3161. He could stand "frequently" but with positional changes to manage his symptoms. *Id.*

Plaintiff complained of pain, soreness, tightness, fatigue, and an inability to engage in life activities with his family. AR 3158. Plaintiff demonstrated "valid effort" in thirteen out of fifteen measurements (87%), "suggesting that [Plaintiff] was mildly inhabited (sic) by his symptoms." AR 3157. The evaluator found the most limiting factors to include decreased tolerance of sitting in a chair, poor pain management, decreased activity tolerance, decreased tolerance of sustained activity with his arms in flexion or abduction, and "time consuming" self-massage and stretching. *Id.*

15. On May 8, 2011, the Social Security Administration notified Plaintiff that he became disabled under their rules on June 25, 2009, and was entitled to disability benefits beginning in December 2009. AR 3109.

16. LINA also referred Plaintiff's claim to the Special Investigations Unit. AR 3119. Between May 5 and 10, 2011, a surveillance investigation was conducted and thirty-one minutes of surveillance footage was obtained. AR 3119-20. LINA found "no significant results" from the surveillance. AR 4344.

17. On May 27, 2011, Dr. Larry Featherston, a rehabilitation specialist, conducted a Transferrable Skills Assessment ("TSA") based on the second FCE. AR 4345. He concluded that while Plaintiff could perform certain occupations, none of those occupations met the wage requirement. *Id.*

18. Upon completion of the FCE, the investigation by the Special Investigations Unit, and the TSA by Dr. Featherston, LINA approved Plaintiff's disability benefits as to "any occupation." AR 4344. This refers to the second definition for disability requiring the

claimant to be "unable to perform all the material duties of any occupation" or "unable to earn 80% or more of his or her Indexed Covered Earnings." AR 4.

19. On June 2, 2011, LINA informed Plaintiff by letter that his benefits would continue long-term beyond January 1, 2012. AR 2052.

### B. Recertification and Denial in 2015

20. On October 25, 2015, LINA informed Plaintiff by letter that it was conducting a recertification of his LTD benefits. AR 1993. LINA requested that Plaintiff complete a Disability Questionnaire and to verify whether he continued to receive Social Security disability benefits. *Id.* Plaintiff verified that he was still receiving Social Security disability benefits. AR 1994. He also submitted the Disability Questionnaire. AR 1520.

21. On November 17, 2015, Plaintiff underwent a SUDOSCAN, which is a test that measures sudomotor function. AR 3657. The test can assist in identifying peripheral or autonomic neuropathy, but "a clinical diagnosis must be made by the physician in the context of all available information." *Id.* For Plaintiff, the SUDOSCAN report showed "normal levels of skin conductance." *Id.*

22. Dr. Salvato interpreted the test results as his treating physician for neuropathy. AR 2239. She reported that Plaintiff received treatment for "small fiber sensory neuropathy diagnosed by skin biopsy in 2011." *Id.* Despite the test result, she concluded that Plaintiff's SUDOSCAN "does not change his diagnosis of the neuropathy as the test shows his conduction and symmetry are 68 when normal is 80." *Id.* In other words, the SUDOSCAN does not undermine Plaintiff's already-established diagnosis of neuropathy and was interpreted by his treating physician as an abnormal test result.

23. On December 1, 2015, Plaintiff underwent an FCE by Enrique Colon. AR 1230. The results of this evaluation found that, based on the physical demand level as defined by the DOT standards, Plaintiff's abilities rated as a "No Safe Work Capacity" when "based on all of the obtained objective evidence." AR 1231.

   a. The evaluator largely based this conclusion on the "Functional Range of Motion" tests and the fact that Plaintiff cannot sit comfortably on a chair "making any gainful, safe, or dependable work just not realistically possible." *Id.*

   b. The evaluator found that Plaintiff can sit for eighteen minutes with a lot of static shifting; stand for twenty-six minutes; and intermittently stand, sit, and walk for over 120 minutes. AR 1232. He could also safely and dependably carry or lift up to ten pounds in varying movements on an occasional basis—but not frequently or constantly. AR 1231.

   c. The evaluator further found that Plaintiff was restricted in various activities, including prolonged sitting, prolonged standing, prolonged walking, lifting occasionally floor to waist, lifting occasionally floor to shoulder, lifting occasionally waist to shoulder, carrying, pushing, pulling, crouching, kneeling, bending, stooping, climbing, overhead reaching, and reaching below waist level. *Id.* Further, Plaintiff was reported to have poor body mechanics, poor work endurance, restricted pinch grip, and high pain levels. *Id.*

   d. The evaluator noted that Plaintiff provided "good," "maximal," and "consistent" effort throughout the FCE and was of the opinion that the results were a "true indication of Mr. Batchelor's present physical abilities." AR 1231-32.

24. Dr. Salvato provided a letter, dated December 2, 2015, where she described her care and evaluation of Plaintiff. AR 319-21. Dr. Salvato reported that Plaintiff has been under her care since June 23, 2009, and "[h]is condition has not improved over that period of time." AR 319. She described Plaintiff being treated by numerous doctors with multiple therapies for his symptoms, but "they have not improved his quality of life or his symptom complaints." AR 319.

   a. Dr. Salvato reported that Plaintiff "has both subjective and objective evidence that he cannot maintain the duties of an occupation on a consistent basis." AR 321. The objective evidence includes his pain, decreased range of motion, decreased strength, constant movement with inability to sit, and ongoing severe fatigue. *Id.* She concluded that Plaintiff "remains totally disabled from any gainful employment." AR 321.

25. On December 28, 2015, Dr. Alladice confirmed that Plaintiff has undergone "extensive testing including MRIs, CTs, EMG/nerve conduction studies, muscle and nerve biopsies," and has been diagnosed with [Epstein-Barr virus], Lyme disease, small fiber sensory neuropathy, laryngopharyngeal reflux, hyperglycemia, and severe myofascial pain syndrome. AR 322. Dr. Alladice reported that Plaintiff is "very limited" in his ability to sit or hold any static position for prolonged amounts of time due to increased pain, cramping, twitching, numbness, and tingling throughout the day. *Id.*

26. On January 27, 2016, Dr. Alladice conducted a Physical Ability Assessment ("PAA") in which she concluded that Plaintiff was "unable to sustain" sitting, standing, or walking over the course of eight hours and "definitely not on [a] consecutive basis." AR 489. She

further concluded that Plaintiff "is unable to sustain any position for more than 15 minutes. He requires frequent position changes [and] rest breaks. He is unable to perform these activities on any consistent basis." AR 490. The PAA indicated that Plaintiff could lift or carry up to ten pounds, push a maximum of fifteen pounds, and pull a maximum of fourteen pounds. AR 492.

27. In 2016, LINA referred Plaintiff's claim to the Special Investigation Unit a second time. AR 3568. A field investigation was conducted from February 17 to 19, 2016. AR 3570. The investigative report provided that they had "obtained approximately twenty minutes of film and an additional eight minutes of covert film of the claimant walking, driving, sitting in the driver's seat of his vehicle for an extended period of time, bending at the waist, squatting, reaching for various unknown items, eating breakfast inside a grocery store, eating inside a donut shop, carrying a shirt, and placing various items into the trunk of his vehicle. The claimant appeared to perform these activities in a fluid and unrestricted manner." AR 3569.

28. On July 7, 2016, Dr. Wright W. Singleton, a specialist in occupational medicine, conducted an Independent Medical Examination ("IME") at LINA's request and referral. AR 2231. Dr. Singleton concluded that "[n]o significant impairment exists." AR 2241. He also found that "[n]o work activity restrictions are medically necessarily," because Plaintiff "has no functional impairment, although he is highly fixated on his subjective feelings of chronic pain. There are no objective findings to limit return to work activities." *Id.* After viewing the surveillance video obtained in February 2016, Dr. Singleton concluded that "the lengthy surveillance supports the opinions rendered that this individual is without any impairment or disability." AR 2242.

29. Dr. Singleton also completed a Physical Ability Assessment, in which he reported that Plaintiff could tolerate sitting, standing, walking, reaching (overhead, desk level, below waist), conducting fine manipulation, conducting simple and fine grasp, balancing, stooping, kneeling, crouching, and crawling for greater than 5.5 hours a day or two-thirds of an eight-hour day. AR 2242-43. He further reported that Plaintiff could carry and lift ten pounds for the same amount of time, eleven to twenty pounds for one-third to two-thirds of the day, and twenty-one to fifty pounds for up to one-third of the day. AR 2243. Finally, Dr. Singleton concluded that Plaintiff could push and pull up to 250 pounds for greater than two-thirds of the day. *Id.*

30. On July 21, 2016, another TSA was conducted at LINA's request, to determine if occupations exist that Plaintiff could perform and that also met the wage requirement. AR 1517. The TSA was based on Dr. Singleton's IME and identified two potential occupations: petroleum engineer (Plaintiff's former occupation) and project engineer. AR 1518.

31. On August 11, 2016, LINA informed Plaintiff via letter that he would no longer be considered eligible for LTD benefits beyond August 10, 2016. AR 1519. LINA had not received, and therefore not reviewed, a copy of the most recent FCE conducted on December 1, 2015. AR 1520. However, LINA had reviewed Dr. Alladice's PAA which referenced the FCE. *Id.*

### C.  Plaintiff's First Appeal

32. On March 1, 2017, Plaintiff appealed the discontinuation of his LTD benefits and provided additional evidence. AR 999. The supplemental evidence included Dr. Alladice's opinion letter rebutting Dr. Singleton, Dr. Salvato's opinion letter rebutting Dr. Singleton,

Plaintiff's affidavit describing his symptoms and impairment, a PAA conducted by Dr. Mark Levin, a PAA conducted by Dr. Salvato, a vocational rehabilitation assessment conducted by Dr. Thomas King, and the FCE that LINA had not received previously. AR 999-1000.

33. In her letter, Dr. Alladice expressed concern that Dr. Singleton's IME failed to consider much of the medical evidence on record. AR 324-25. It was her "medical opinion that Mr. Batchelor remains disabled," and "cannot return to work," as reflected in her 2016 PAA and the December 2015 FCE. AR 324, 329. Dr. Alladice identified various omissions and errors made by Dr. Singleton in his IME. AR 325-30.

   a. She wrote that "individuals with chronic myofascial pain . . . often do not have visible limitations. Their pain is debilitating . . . [t]heir stamina for sustained and daily activity is severely limited." AR 329. She explained that Dr. Singleton's IME understated Plaintiff's complaints as "aches and pains," when these symptoms result in "significant debilitating pain accompanied by tightness, spasm and trigger points, and the complications of fatigue, soreness in the throat from laryngopharyngeal reflux, pruritus, and constipation." AR 332.

   b. Dr. Alladice recognized that conditions like fibromyalgia often center on the subjective symptoms of pain, but noted that those symptoms also result in or are accompanied by physical findings. AR 333-34.

   c. Based on her treatment, the medical records, and the FCEs, Dr. Alladice opined that Plaintiff is "physically functionally impaired." AR 334. Plaintiff is restricted in his sitting, standing, and walking, and cannot sustain any activity over an 8-hour

day, much less sequential days. Plaintiff has no safe work capacity, including no
capacity for light or sedentary work. AR 334-35.

d.  Dr. Alladice further pointed out that Dr. Singleton erroneously proclaimed the FCE
conducted in 2011 was invalid. Rather, both the 2011 and 2015 FCEs had taken
into consideration established validity criteria and determined the measurements
were valid. AR 332. For example, the 2015 FCE stated thirteen out of fifteen
measurements were valid, and the results were a true indication of Plaintiff's
physical abilities. *Id.*

e.  Regarding the surveillance video obtained by LINA, Dr. Alladice opined that the
footage was consistent with Plaintiff's reporting and other clinical findings. AR
336. She noted that the videos do not show him doing any activity for long periods
or lifting items that are heavy or on a frequent basis. *Id.*

34. Dr. Salvato wrote a letter on January 4, 2017, also disagreeing with Dr. Singleton's IME
and expressing concern over the relevant information that was omitted. AR 344.

a.  She explained that Plaintiff has been diagnosed with fibromyalgia in accordance
with the criteria issued by the American College of Rheumatology, including tender
points in eleven out of eighteen tender point areas of the body, fatigue, and chronic
symptoms lasting longer than three months. AR 346.

b.  Dr. Salvato wrote that Plaintiff has reduced functional capacity, resulting from his
health conditions, and which affect his ability to work. AR 347. She based this on

the medical records, including FCEs, the Disability Questionnaire, and Plaintiff's reporting. *Id.*

c.  She took issue with Dr. Singleton's minimization of Plaintiff's complaints, explaining that Plaintiff's complaints were instead of "full body pain which is always present and becomes severe, and which he must address with management of activity and a considerable amount of therapy on a daily basis. He complains of sore throat and vocal chords, painful swallowing, sensation of substance in throat or food that won't go down, and difficulties with fatigue, constipation, itching, and difficulties with sleep . . . He complains of limitations from all of these, including limitations in sitting, standing, holding positions for long, repetitive activities." AR 345.

d.  Dr. Salvato reported that Plaintiff "is impaired by pain, fatigue, sleep loss, muscle tightness, trigger points, and other conditions that result from myofascial pain syndrome and fibromyalgia." AR 348. "Among other things, the myofascial pain impairs his ability to sit, use the computer, and his ability to perform activities repetitively or hold a position for long. He is impaired by pelvic pain . . . He is impaired by carpal tunnel syndrome . . . [t]hroat soreness, voice soreness, and hoarseness from laryngopharyngeal reflux impair his capacity for speaking. He should avoid kneeling due to torn meniscus in each knee." AR 348.

e.  In speaking to Plaintiff's work capacity, Dr. Salvato concurred with Dr. Alladice that Plaintiff's PAAs and FCE show he cannot complete light or sedentary work, but rather had "[n]o safe work capacity." AR 349. She also noted that, contrary to

Dr. Singleton's remarks, the FCEs were valid, reliable, and "appropriately controlled for validity." AR 344.

    f.  Dr. Salvato also reviewed the surveillance footage. She found the activity was not inconsistent with her clinical findings and did not change her opinion that Plaintiff was disabled. AR 350. She made various specific findings in how the footage was consistent with his functional limitations. AR 350-52. For example, she noted that Plaintiff drove for thirty minutes or less, walked short distances and times, lifted or carried items less than ten pounds, did not sit for long periods of time, and sat in places that allowed for transitioning positions. AR 351-52. She also explained that the footage did not show Plaintiff performing any activity on a "frequent" or "constant" basis—what would be required in an eight-hour sedentary workday or on a consistent basis. AR 350-51.

35. On January 25, 2017, Dr. Salvato provided additional test results which showed continued cervical disc degeneration, lumbar disc degeneration, and elevated creatine kinase consistent with myositis. AR 440. She reported that these findings "contribute to his disability," and affirmed that Plaintiff "remains disabled and unable to work." *Id.*

36. Dr. Mark Levin, an internal medicine physician certified by the "[B]oard of Utilization Review and Quality Assurance," also conducted a review of Plaintiff's records. AR 447. He found Plaintiff to be "physically limited with significant limitations from multiple chronic conditions." AR 448. He observed that Plaintiff's conditions have been assessed by multiple physicians and a variety of tests over the past decade, "including MRI, EMG,

NCS, DEXA, endoscopy," and others. AR 448. Plaintiff's physical condition showed "that he physically has not the tolerance for working, particularly an eight hour per day job." *Id.*

  a. Dr. Levin noted that Plaintiff could not sit for more than a few minutes at a time or engage in repetitive work-related activities. *Id.* He also had "below competitive scores" in functional range of motion testing, as well as physical limitations in lifting and carrying (supported by the presence of neck and back pain, degenerative disc disease, and osteoporosis). AR 449. Dr. Levin found the various FCEs were reliable and illustrated such physical restrictions. *Id.* Dr. Levin also completed a PAA form, in which he indicated "no sitting" and only an occasional ability to conduct any other type of activity besides seeing and hearing. AR 451-52.

  b. Dr. Levin also found that the surveillance video did not reflect Plaintiff's limitations and restrictions, as it was episodic in nature. AR 449. He ultimately concluded that Plaintiff's conditions impaired any work performance, that improvement was not expected, and that simply working under restriction would interfere with necessary care and aggravate his conditions. AR 450.

37. Dr. Thomas King completed a vocational rehabilitation assessment which included a review of Plaintiff's records as well as a personal assessment. AR 940. He opined that if Randy Norris, the rehabilitation specialist who completed a TSA on July 21, 2016, had reviewed all of Plaintiff's records, he would have determined that Plaintiff is unable to perform a sedentary work level and thus cannot perform any occupation. AR 948. He further opined that even if Plaintiff were able to work, he would be unable to earn the 80% of the wage requirement under LINA's definition of disability. *Id.* This was based on

Plaintiff being out of work for over seven years, his current impairments, and the fact that almost all of his engineering work was over fifteen years ago. AR 940, 943.

38. Yet another FCE was conducted on March 21, 2017, by Angela Skrabanek. AR 2185. "Based upon the objective findings of the FCE," it was her professional opinion that Plaintiff could not "safely and dependably return to work at this time as a purchasing engineer/drilling engineer or any other position" because he did not qualify for even sedentary work based on his performance. AR 2186.

   a. She described various physical limitations, including no lifting, carrying or transferring over five pounds; reaching at or below waist level in prolonged static standing position only on an occasional basis; limited driving; stair climbing limited to one flight with accommodations; avoiding sitting in upright chairs; standing limited to forty-five minutes for one to two hours per day; walking limited to forty-five minutes for one to two hours per day; frequent rest breaks with frequent changes in position every five to ten minutes; poor pain management that inhibited concentration and required lying down or massage therapy; decreased lumbar and cervical range of motion; decreased spinal stability with carpal tunnel pain restricting the ability to complete a computer or table task; below average grip strength with only occasional, repetitive use of hands; and limited speaking due to pain, hoarseness, reflux, and muscle spasms. AR 2186-87.

   a. These conclusions were supported by the range of motion tests, grip tests, and similar testing documented in the FCE. AR 2190-2212.

b.   Skrabanek conducted validity measures, and reported that Plaintiff provided consistent and full effort throughout the testing, supported by increases in heart rate and evaluator observations. AR 2190-91.

39.   Based on this FCE, Dr. Suzanne Manzi physically examined Plaintiff and submitted yet another PAA in which she noted that Plaintiff was unable to sit, only able to stand or walk for 1 to 20% of the day, and only able to perform other activities between 1 to 10% of the day. AR 481-82.

40.   As part of the appeal process, LINA obtained a peer review of Plaintiff's records from Dr. Gregory Smith, an occupational medicine specialist. AR 589. Dr. Smith determined that Plaintiff has "several objectively supported conditions which result in some functional impairment," and was "physically functionally limited from 09/12/16 and continuing." AR 613. He noted Plaintiff's cervical and lumbar degenerative disc disease, leading to symptoms which increased with prolonged static positions. *Id.* He also discussed Plaintiff's prior right elbow surgery and bilateral carpal tunnel syndrome. *Id.* Upon his review of the surveillance footage, he opined that the footage supported mild to moderate levels of functional limitations. *Id.* Dr. Smith further concluded that Plaintiff has opioid dependency syndrome which results in "transient cognitive and coordination issues with each dose." *Id.* However, Plaintiff had other co-existing conditions, including gastroesophageal reflux disease, hypertension, and dysphagia, that "did not have associated functional limitations." *Id.* Dr. Smith also reported that Plaintiff had subjective complaints of "diffuse total body pain"—apart from the physically limiting conditions—which he found did not "create objectively supported" functional limitations. *Id.*

    a.  Based on his review, which was done without any personal examination, Dr. Smith reported Plaintiff could constantly reach and sit (for sixty minutes with a five-minute break), but could only occasionally perform all other activities like standing, walking, climbing stairs, fine manipulation, and grasping. AR 614. Additionally, Dr. Smith submitted an addendum in which he discounted the 2017 FCE because Plaintiff had terminated some of the tasks during the evaluation and the evaluator had not reviewed the surveillance footage. AR 615.

41. Plaintiff also submitted an affidavit in which he described his debilitating and excruciating pain, how his conditions become aggravated, and the wide range of treatments he must undertake to manage his conditions. AR 656-61. Plaintiff wrote that his conditions not only worsen with activity, but will continue to lead to increased pain even after he ceases an activity. AR 656. To manage his symptoms, his treatment includes myofascial release therapy, limiting activities to avoid aggravation, and medications. *Id.*

    a.  Plaintiff's condition limits his ability to sustain any position for more than a brief period, including sitting, standing, and performing computer work. AR 657. Any escalation in pain only further limits his ability to be in certain positions. AR 658. Even alternative positions in a chair, such as sitting on the forward edge or with legs crossed, causes an increase in pain. AR 657. As a result, Plaintiff spends his entire day alternating positions from standing, walking, and various floor positions. *Id.*

   b.  Plaintiff uses a litany of medications to manage his various conditions, though none

       of them provide full relief. AR 659. The medications cause additional side effects,

       including drowsiness, sleep, lethargy, headache, and nausea. *Id.*

   c.  Plaintiff is able to complete light chores, such as cooking, laundry, and buying

       groceries. AR 660. To do so, he must manage pain before and after said activity.

       *Id.* Plaintiff can also drive twenty to thirty minutes with forward-seat adjustment

       and a board or cushion that allows for reduced pressure on the backs of his thighs.

       *Id.* However, the accommodations do not avoid some pain, spasms, and cramping.

       *Id.* Plaintiff is also able to dine out for short meals if there is a bar that allows for

       standing. *Id.*

   d.  Plaintiff's ability to work is diminished, as he cannot perform predictably or

       reliably, many activities aggravate his conditions, and managing his conditions

       takes substantial time and focus. AR 660-61.

42. LINA also requested a second TSA that was completed by rehabilitation specialist Tony

    Miller. AR 4438. Miller relied on Dr. Smith's peer review to conclude that Plaintiff could

    perform the job of "district supervisor, mud-analysis well logging." AR 4439.

43. On June 22, 2017, LINA notified Plaintiff that his appeal had been denied. AR 672. LINA

    relied on Dr. Smith's opinions, including that the results of the 2017 FCE were invalid. *Id.*

    LINA wrote to Plaintiff that it "did not dispute you may have been somewhat limited or

    restricted due to our subsequent diagnoses and treatment; however an explanation of your

    functionality and how your functional capacity continuously prevented you from

    performing the material duties of any occupation was not clinically supported." AR 673.

22

### D. Plaintiff's Second Appeal

44. On January 29, 2018, Plaintiff appealed LINA's decision a second time. AR 762-99.

45. As part of that appeal, LINA obtained another peer review from Dr. Uchechukwu Elendu, an occupational medicine physician. AR 2255-64. Dr. Elendu found Plaintiff to be "physically functionally limited from 9/11/2016 and continuing." AR 2262. He based this on multiple diagnosed conditions, including degenerative disc disease, scoliosis, carpal tunnel syndrome, neuropathy associated with type 2 diabetes, osteoporosis, hiatal hernia, and various injuries. *Id.* He also explicitly noted that Dr. Singleton's IME was not supported by the record. AR 2263. Yet, Dr. Elendu further found Plaintiff was not functionally limited from a range of other diagnoses—including but not limited to chronic pain syndrome, fibromyalgia, plantar fasciitis, heel ulcers, pelvic pain, and meniscus tears. AR 2262-63.

    a. With regards to fibromyalgia and chronic fatigue syndrome, Dr. Elendu stated such conditions have no objective findings, have no basis for work limitations, and whether or not the rewards of work outweigh the symptoms is the patient's choice. Rather, the issue of such conditions is solely based on the patient's tolerance, and doctors should not certify disability based "only on tolerance." *Id.*

    b. Dr. Elendu also made conclusions about Plaintiff's physical abilities: Plaintiff can sit for forty-five minutes at a time, alternating with standing or walking for five minutes before sitting again, for up to seven hours in an eight-hour workday. AR 2263. Plaintiff can also stand for twenty minutes for up to two hours total; walk for twenty minutes for up to two hours total; lift and carry up to twenty pounds occasionally and ten pounds frequently; push and pull up to twenty-five pounds

occasionally and fifteen pounds frequently; perform simple grasp, fine manipulation, and power grasp occasionally; reach above shoulder level and below waist level occasionally; reach at waist level without restriction; and climb stairs, kneel, crawl, squat, bend at the waist or stoop occasionally. *Id.* Dr. Elendu did not explain his discrepancies with the FCE conducted on March 21, 2017 nor raise any issues with the validity of that FCE.

46. LINA also obtained a third TSA conducted by Mary Faltaous, a rehabilitation specialist. AR 4295-96. Ms. Faltaous relied on Dr. Elendu's opinions to conclude that Plaintiff could complete the work of a district supervisor, mud-analysis well logging. AR 4296.

47. With regard to cognitive impairment, LINA obtained an independent peer review for psychological or mental diagnoses, conducted by Dr. Lawrence Schloss. AR 2220. Dr. Schloss did not personally examine Plaintiff, but he concluded that Plaintiff's records did not support any DSM-5 diagnoses. AR 2226.

48. On May 8, 2018, LINA notified Plaintiff that his second appeal was denied and that he had exhausted all administrative rights to appeal. AR 526-30.

## IV.   CONCLUSIONS OF LAW

The issue before the Court is whether Plaintiff has shown he is "disabled" as defined in LINA's Policy, and thus entitled to disability benefits. Under that definition, the Court must determine whether Plaintiff is "unable to perform all the material duties of any occupation for which he is or may reasonably become qualified," or "unable to earn 80 percent or more of his indexed covered earnings." AR 4.

The parties do not dispute that Plaintiff has a multitude of diagnosed conditions, or that Plaintiff is physically and functionally limited to some extent. The dispute centers instead on

whether Plaintiff's functional limitations rise to a level where he cannot perform all of the material duties of any qualifying occupation, in accordance with the Policy's definition of disabled. The discrepancies arise in the specific physical limitations caused by his diagnoses, which in turn, leads to differing opinions on whether Plaintiff is disabled or not.

When faced with opposing opinions, courts have recognized that an examining physician has the opportunity to assess the severity and veracity of the plaintiff and her symptoms—while a physician reviewing a cold record lacks such opportunity for first-hand observations. *Neumann v. Prudential Ins. Co. of America*, 367 F. Supp. 2d 969, 990 (N.D. Okla. 2005). In *Neumann*, "every expert who physically examined or personally interviewed plaintiff concluded that she was unable to return to the work force in any capacity," while every expert who concluded the plaintiff was not disabled had "never examined or interviewed plaintiff, but merely reviewed her medical file." *Id.* at 989. The court held that the opinions of those who had not examined the plaintiff were not persuasive, while the examining physician's opinions were "entitled to persuasive, indeed decisive, weight."[6] *Id.*

The same is true here. The physicians and evaluators who personally treated or examined Plaintiff concluded that Plaintiff is physically impaired and unable to work at any capacity, including light or sedentary work. This includes Drs. Alladice and Salvato, as well as the most recent FCE evaluators, Mr. Colon and Ms. Skrabanek. The only physicians who concluded Plaintiff is not disabled are the LINA physicians who never personally examined Plaintiff. Based on those limitations, the Court is not persuaded by their opinions, but rather gives persuasive and

---

[6] While two of the reviewing physicians were also employees of the defendant in *Neumann*, the same credibility conclusion was made to others that were not. 367 F. Supp. 2d at 990. The reasoning applies equally to the present reviewing physicians, regardless of any conflicts of interest.

decisive weight to the examining physicians.

While Dr. Singleton did physically examine Plaintiff and concluded he had no physical impairment nor work restrictions, Dr. Singleton's opinions have been shown as contradictory to the evidence and were explicitly denounced by Dr. Elendu, LINA's own physician. His opinions were also no longer relied upon in LINA's denial letters on appeal. Therefore, the Court finds Dr. Singleton's opinions to be without value.

LINA makes much about the fact that, under the abuse of discretion standard, there is no deference required to "treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003). The Court agrees with LINA, but finds that principle inapplicable to the *de novo* standard here. Under *de novo* review, the Court is mandated to evaluate the persuasiveness of the evidence independently, and may give more weight to a treating physician's opinions if it finds them more reliable and probative. *Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1044 (E.D. Tex. 2019); *see also Neumann*, 367 F. Supp. 2d at 990 (rejecting defendant's argument that treating physicians should not be given special weight under *de novo* standard where physicians also examined the plaintiff). Even under the abuse of discretion standard, reliable opinions of a treating physician may not be arbitrarily discredited. *Black & Decker*, 538 U.S. at 834.

Dr. Alladice and Dr. Salvato's opinions are more reliable and probative not solely because of their status as Plaintiff's treating physicians, but because as examining physicians, they "ha[d] more information upon which to base such opinions than physicians who only have the benefit of a written record." *Pike*, 368 F. Supp. 3d at 1044 (internal citation omitted). In short, the Court finds the physicians who completed a personal examination are more persuasive than those who made novel conclusions about Plaintiff's physical abilities solely from a record review.

26

The Court has additional reasons for limiting its reliance on the opinions of LINA's physicians. First, Dr. Smith's peer review found that Plaintiff had several objectively supported conditions which resulted in some functional impairment. However, he went on to conclude that Plaintiff was not functionally limited by other conditions because he could not "objectively" support them. Dr. Smith incorrectly discounted the 2017 FCE, based on Plaintiff terminating some of the tasks and the evaluator not having reviewed the surveillance footage. The evaluator explicitly noted that Plaintiff had provided full, consistent efforts, and supported the validity of the measurements. Further, the evaluator's role was to report Plaintiff's performance on the standard tests and protocols. In turn, Plaintiff's physicians then interpreted the FCE, video, and any other evidence to conclude Plaintiff was disabled. The evaluator need not have reviewed the surveillance footage to make her measurements and conclusions reliable. Dr. Smith erred in ignoring the FCE's objective evidence supporting Plaintiff's physical limitations in his functional capacity.

The Court is also not persuaded by Dr. Smith's physical ability assessments, such as being able to sit constantly for up to sixty minutes with only a five-minute break, because they contradict the FCEs and were made without a personal examination. Similarly, the Court is unsettled by Dr. Smith's novel conclusion that Plaintiff is cognitively impaired by an opioid dependency syndrome. This conclusion was made without personally examining Plaintiff or even citing to a specific medical record in support.

Lastly, as discussed below, the Court rejects LINA's argument that the footage is inconsistent with the FCE findings and opinions from Plaintiff's physicians. Therefore, Dr. Smith failed to consider the objective evidence, such as the FCEs and PAAs. For these reasons, the Court finds limited value in Dr. Smith's opinions about Plaintiff's physical abilities—the central question here.

Second, Dr. Elendu also found that Plaintiff was physically functionally limited by some diagnosed conditions, but not by others. He asserted that fibromyalgia and chronic fatigue syndrome can never be the basis for work limitations and that the sole issue in those cases is the patient's tolerance. While pain may be a "subjective disability" that is not always objectively quantifiable, it is improper to 'discount[] the subjective evidence of Plaintiff's pain and objective evidence corroborating the disability." *Schexnayder v. CF Indus. Long Term Disability Plan for its Employees*, 553 F. Supp. 2d 658, 667 (M.D. La. 2008) (finding abuse of discretion where insurer discounted evidence of pain and relied on non-examining physicians' opinions), *aff'd in part, rev'd on other grounds sub nom.*, *Schexnayder v. Hartford Life & Acc. Ins. Co.*, 600 F.3d 465 (5th Cir. 2010). Under an independent evaluation, the Court finds that Dr. Elendu's conclusions did not properly value the evidence of pain combined with corroborating, objective evidence. Indeed, his opinions suggest that a person suffering from fibromyalgia or chronic fatigue can never prove functional limitations. This Court rejects such a categorical and unsupported rule.

Even if the Court accepts Dr. Elendu's assertion that doctors should not certify disability in such patients based *only* on tolerance, that is not the case here. Plaintiff has provided not only subjective evidence of pain—which should be considered—but also objective evidence supporting his physical limitations. The FCEs and PAAs show that his conditions affect his physical *ability* to do certain tasks and are not solely based on tolerance. As with Dr. Smith, Dr. Elendu's conclusions not only contradict the opinions of those who personally examined Plaintiff, but do not explain how novel conclusions can be made about Plaintiff's physical abilities without a personal examination. Thus, the Court finds Dr. Elendu's opinion of even less persuasive value.

As illustrated by the physicians' competing opinions, the conditions at the crux of this dispute are Plaintiff's fibromyalgia and chronic fatigue syndrome. The Court is aware that Plaintiff

28

suffers from a multitude of other conditions which, particularly in combination with the aforementioned conditions, also result in physical functional impairment. This includes but is not limited to Plaintiff's degenerative disc disease, muscle spasms, osteoporosis, and carpal tunnel syndrome. However, the parties' arguments center on whether there is objective medical evidence that Plaintiff's fibromyalgia and chronic fatigue have led to a physical functional impairment, such that he is disabled under the Policy's definition.

"Because proving the disease is difficult . . . fibromyalgia presents a conundrum for insurers and courts evaluating disability claims." *Adams v. UNUM Life Ins. Co. of Am.*, No. CIV.A. H-04-2179, 2005 WL 2030840, at *31 (S.D. Tex. Aug. 23, 2005) (internal citation omitted) (comparing authority on treatment of subjective symptoms and objective limitations). Nonetheless, "[w]hile the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis." *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16 n.5 (1st Cir. 2003). Plaintiffs may still meet their burden by providing "objective evidence that these illnesses rendered [him or] her unable to work." *Id. Cf. Karvelis v. Reliance Standard Life Ins. Co.*, No. H–03–3848, 2005 WL 1801943, at *19 (S.D. Tex. July 28, 2005) (finding that the plaintiff's FCE had provided objective medical evidence of her physical capabilities).

At the outset, there is no conundrum present in proving Plaintiff's diagnoses because LINA recognizes that he has been diagnosed with these conditions. But Plaintiff has not only proven his diagnoses; he has also provided objective evidence to show how his conditions have led to functional impairments on his physical abilities. In fact, LINA has itself recognized that an FCE provides valid, objective evidence to prove disability. When LINA first denied Plaintiff's LTD benefits in 2009, it did do because his evidence "lacked documentation of functional deficits by

clinically measurable testing (such as validate[d] range of motions or strength measurements)." AR 2068. Once Plaintiff submitted an FCE, providing such evidence of functional deficits, LINA thereafter approved Plaintiff's LTD benefits.

In 2015, LINA also noted in its denial letter that Plaintiff failed to provide his most recent FCE. On appeal, Plaintiff submitted the FCE conducted in 2015, and an additional FCE was provided in 2017. But since its denial in 2015, LINA has discredited the FCEs in an attempt to argue that Plaintiff has not provided objective medical evidence. The Court finds that not only are the FCEs valid reliable measures of Plaintiff's functional deficits, but they also provide the evidence LINA has precisely requested in the past. LINA cannot rebuff evidence that is in line with its own standards by arbitrarily rejecting its validity. The Court therefore rejects LINA's attempts to discredit the FCEs, and accordingly finds that the FCEs provide substantial proof of Plaintiff's physical limitations.

Despite Plaintiff's various FCEs, PAAs, and treating physician reports, LINA is adamant that Plaintiff has failed to provide objective evidence of his physical limitations. LINA relies on *Giertz-Richardson v. Hartford Life & Accident Ins. Co.*, 536 F. Supp. 2d 1280, 1292 (M.D. Fla. Mar. 7, 2008) and presents the case as "strikingly similar" to the instant matter. (Doc. 16 at 20). While both cases are ERISA claims, the similarities end there. In *Giertz*, the court found that the plaintiff had proven a diagnosis, but had not provided sufficient evidence that her reported symptoms were causing impairments in her physical ability to work. *Id.* Indeed, there was ample evidence that the plaintiff was malingering and "attempting to display impairment that was not present." *Id.* at 1285, 1292-93. By contrast, there is no evidence, not even an accusation, that Plaintiff is malingering or lying about his impairments. Plaintiff has provided consistent reporting of symptoms, along with objective evidence on those conditions and his physical limitations.

Because the focus is whether Plaintiff continues to be disabled after LINA initially approved his LTD benefits, the Court places greater focus on the more recent evidence from 2015 and on. This includes the findings in the FCEs, the PAAs submitted by various examining physicians, and the examining physicians' opinions of Plaintiff's ability to work. As discussed in detail above, the FCEs in 2015 and 2017 both concluded that Plaintiff had no safe work capacity, including at a sedentary work level. The physicians who treated and examined Plaintiff further opined, relying on objective evidence like the FCEs as well as their own observations, that Plaintiff did not have the physical capacity to work at any level.

Plaintiff's subjective evidence, including his symptoms and the explanation for his limitations, also carries some weight in the Court's decision. *See Schexnayder*, 553 F. Supp. 2d at 667 ("Accounts of pain cannot be ignored."); *Bigham v. Liberty Life Assurance Company of Boston*, 148 F. Supp. 3d 1159, 1167 (W.D. Wash. 2015) ("[S]ubjective symptoms have been found in previous cases to be valuable evidence for a disability claim."). In his affidavit, Plaintiff described his daily pain and limitations. Plaintiff's statements not only give a window into the hardships and debilitating conditions he suffers from, but shed light on the modest abilities he does have. For example, Plaintiff explains how he is able to drive for short time periods to complete light chores, but how even that activity has consequences on his symptoms. He also explained how he can eat at restaurants for short time periods if there are stools because it gives him the ability to alternate sitting and standing. Plaintiff has been able to adapt to his conditions to complete some light tasks, even if that activity can worsen symptoms and abilities both during and afterwards. His account provides additional support that his physical limitations do not allow for any prolonged or consistent activities, including sedentary work.

The record also includes vocational and skills assessments used to determine which

specific occupations, if any, Plaintiff may work in that meet the wage requirement of $143,794.20 per year. The TSAs obtained by LINA and the vocational rehabilitation assessment obtained by Plaintiff are each based on the corresponding physician's opinions. As such, the Court gives no weight to the TSA conducted by Mr. Norris because it was based on Dr. Singleton's IME—which this Court has concluded has no persuasive value. The Court also finds that the vocational rehabilitation assessment completed by Dr. King represents a more thorough record review than the two other TSAs obtained by LINA. The TSAs completed by Mr. Miller and Ms. Faltaous relied on Dr. Smith and Dr. Elendu's opinions, respectively. As a result, they were both a more constrained assessment and based on conclusions about Plaintiff's physical abilities that this Court does not find convincing. For example, the most recent TSA relied on Dr. Elendu's opinion that Plaintiff can sit for 45 minutes, alternating with five minutes of standing or walking, up to seven hours in a workday. Accordingly, the Court also finds the TSAs less convincing than Dr. King's assessment.

Dr. King relied on the entire medical record, including the FCEs, and thereby provides a more comprehensive, accurate assessment. Dr. King's assessment also took into account that Plaintiff had not worked for over seven years (at that time), and that persons with disabilities tend to make less than non-disabled individuals. He concluded that even if Plaintiff could work, he would likely only earn up to $118,040 as a petroleum engineer, which does not meet the wage requirement.

Even if the Court assumed Plaintiff could physically perform the material duties of district supervisor, mud-analysis well logging, Plaintiff can still show he is either (1) not qualified or reasonably able to become qualified for the position or (2) unable to earn the 80% wage requirement doing that job. Here again, Plaintiff has met his burden. Although Plaintiff has an

engineering education and experience as a drilling engineer, which overlaps with the job in question, almost all of his engineer experience was before 2001. From 2001 to 2008, Plaintiff worked in procurement for BP America, with a brief stint back into engineering in 2008 before he was placed on disability. Not only is Plaintiff's experience greatly outdated, but he is also nearly sixty years old, has now been out of any employment for over ten years, and would require at least moderate work restrictions to complete this sedentary job.

Additionally, a drilling engineer and the supervisor position may be in the same field, but the supervisor position requires doing certain analyses *for* engineers. This suggests the engineer would not have the skill or experience in completing such tasks. For these reasons, Plaintiff has shown that he cannot reasonably become qualified for the district supervisor position. The record also supports the independent conclusion that even if he could become qualified, he would be unable to earn the wage requirement due to the extended break in his career and his disability. Nonetheless, it is entirely sufficient that Plaintiff has substantially met his burden of proving he is disabled because he is unable to perform the material duties of any occupation based on his functional, physical limitations.

The record also includes surveillance videos of Plaintiff from 2011 and 2016. LINA argues that the 2016 footage shows Plaintiff is able to return to work, and that it directly contradicts the treating physician's opinions. Plaintiff's physicians respond that the depicted activity is consistent with his limitations, and Plaintiff further argues that the 2016 footage is not significantly different from the 2011 video that LINA found to have no significance when it initially approved Plaintiff's LTD benefits.

On the Court's review, the video footage does not undermine Plaintiff's diagnoses, symptoms, or physical abilities. Plaintiff does not drive longer than his reported ability of thirty

minutes (with the accommodations described in his affidavit), and he does not walk, sit, or stand longer than he reports an ability to do so. Plaintiff is shown completing light tasks that are consistent with the other evidence stating he can do so on an occasional basis. He completed these activities for short periods of time and frequently alternated positions. The video does not show Plaintiff engaging in standing, sitting, walking, or any activity, for extended periods of time; nor lifting any item that would presumably be over five pounds. The surveillance also makes it clear that Plaintiff can only complete these light tasks on an occasional basis, as he did not undertake the same activities every day he was surveilled. Drs. Alladice, Salvato, and King adequately explain how this video is a mere snippet of Plaintiff's limited activities—which he never represented he could not do—and do not show an ability to maintain positions for extended periods of time nor do any of those tasks on a consistent, repetitive basis. In other words, the video falls short of proving Plaintiff's capacity to complete an eight-hour sedentary workday and much less on a consistent basis.

In an attempt to point to countervailing objective evidence, LINA argues that the SUDOSCAN results shows Plaintiff has improved and is no longer disabled. The test report itself admonished that it was not dispositive, but rather to be read in conjunction with the patient's entire medical record. Further, the test is meant to *diagnose* neuropathy. The parties do not dispute that Plaintiff has been diagnosed with neuropathy, but rather the subsequent issue of whether his diagnoses have resulted in physical impairments. Thus, the test result neither disproves any disputed issue nor does it speak to Plaintiff's physical abilities.

As to the cognitive impairments caused by opioid medication, the Court does not have sufficient information to intelligently rule on whether Plaintiff has an opioid dependency or a cognitive impairment caused by that dependency. In particular, neither party presented a personal

assessment of Plaintiff by a psychologist or relevant health professional. This is of no moment, however, because the evidence regarding Plaintiff's physical limitations is sufficient to show he is disabled.

Finally, the Court gives only slight weight to the Social Security Administration's ("SSA") determination that Plaintiff is eligible for disability insurance. Bearing in mind that the SSA employs a distinct standard from the Policy's standard for disabled, *see Black & Decker*, 538 U.S. at 833, the SSA's determination is not completely irrelevant in this analysis, *Pike*, 368 F. Supp. 3d at 1083. However, the SSA rendered its determination in 2011 and did not conduct any further physical assessment of Plaintiff's disability since then. The dispute here centers on whether Plaintiff *remains* disabled in 2015 and continuing, rendering the SSA determination limited in relevance.[7]

In sum, the administrative record—in particular the FCEs, PAAs, and vocational rehabilitation assessment—shows that Plaintiff is unable to perform all of the material duties of any occupation for which he is or may reasonably become qualified. The objective medical evidence demonstrates that Plaintiff cannot sit, stand, or walk for any substantial period of time, and even with alternating positions, he cannot maintain these activities for a workday or on a consistent basis. Based on those physical limitations, the Court agrees with the examining physicians' opinions that Plaintiff could not perform any occupation. Accordingly, the Court concludes that Plaintiff remains entitled to LTD disability benefits retroactive to the day they were terminated.

---

[7] For similar reasons, the Court finds limited value in the fact that LINA previously approved Plaintiff for LTD benefits and instead focuses on the question of whether Plaintiff remained disabled.

## V.      CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion for a judgment on the record pursuant to Rule 52(a). The parties are ordered to submit a proposed Final Judgment, or to present any disputes as to that judgment, by December 11, 2020.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 1st day of December, 2020.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE